

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-15-2002

# Lapid Laurel LLC v. Zoning Bd Adjustment

Precedential or Non-Precedential:

Docket 0-3625

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Lapid Laurel LLC v. Zoning Bd Adjustment" (2002). *2002 Decisions.* Paper 182.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/182

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

        Filed March 15, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3625

LAPID-LAUREL, L.L.C.;
JOHN AND JANE DOE, Appellants

v.

ZONING BOARD OF ADJUSTMENT OF
THE TOWNSHIP OF SCOTCH PLAINS;
THE TOWNSHIP OF SCOTCH PLAINS;
ALTA A. ROSE; BARBARA HOREV

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civ. No. 99-cv-02461)
District Judge: Honorable Nicholas H. Politan

Argued: September 7, 2001

Before: BECKER, Chief Judge, ALITO and BARRY,
Circuit Judges.

(Filed: March 15, 2002)

        STEVEN C. ROTHER, ESQUIRE
         (ARGUED)
        A. ALBERT LUGO, ESQUIRE
        411 Hackensack Avenue
        Continental Plaza II
        Hackensack, NJ 07601

        Counsel for Appellants

STEPHEN EISDORFER, ESQUIRE
  (ARGUED)
Hill, Wallack
202 Carnegie Center
Princeton, NJ 08904

Co-Counsel for Appellees
Township of Scotch Plains

FRANK N. YURASKO, ESQUIRE
P.O. Box 1041
139 West End Avenue
Somerville, NJ 08876

Co-Counsel for Appellees
Township of Scotch Plains

DOUGLAS W. HANSEN, ESQUIRE
P.O. Box 640
1824 Front Street
Scotch Plains, NJ 07076

Co-Counsel for Appellees
Township of Scotch Plains

ANTHONY D. RINALDO, JR.,
 ESQUIRE
Garrubbo, Romakow & Rinaldo
53 Cardinal Drive
Westfield, NJ 07090

Co-Counsel for Appellees
Zoning Board of Scotch Plains

OPINION OF THE COURT

BECKER, Chief Judge.

Plaintiff Lapid-Laurel, L.L.C. ("Lapid"), a real estate development firm that unsuccessfully sought approval from the Zoning Board of Adjustment of the Township of Scotch Plains, New Jersey ("the Board") to build a 95-bed care facility for the elderly, appeals the District Court's grant of summary judgment in favor of the Board and the Township, defendants in Lapid's civil case, challenging their actions

under the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. S 3601 et seq. Lapid based its claims in the District Court primarily on two separate theories under the FHAA. First, Lapid contended that Scotch Plains's zoning system had a disparate impact on the elderly handicapped in violation of 42 U.S.C. S 3604(f). Second, Lapid claimed that the Board failed to "make reasonable accommodations" in order to facilitate housing for the elderly handicapped in violation of 42 U.S.C. S 3604(f)(3)(B).

Lapid's primary contentions on appeal are that: (1) because the Board failed to engage in the "interactive process" that we have held is required of employers by the Rehabilitation Act of 1973, 29 U.S.C. S 701 et seq., and because the Board erroneously denied Lapid's request to bifurcate its variance and site plan applications, thereby depriving it of a full enough record, the District Court erred by limiting its review to the administrative record on the reasonable accommodations claim; and (2) it was error for the District Court to grant summary judgment on both the reasonable accommodations and discriminatory impact claims.

We resolve the first claim adversely to Lapid by declining to extend the "interactive process" requirement that exists in the employer-employee context of the Rehabilitation Act to the housing and land use context of the FHAA. We conclude that the process was never intended to apply in this context, and would be especially inappropriate to apply to local land use boards, which already face detailed procedural requirements under state law. We will also affirm the District Court's grant of summary judgment on both the reasonable accommodations and disparate impact claims. Before doing so, we must determine which party bears the burden of establishing the various elements of an FHAA reasonable accommodations challenge to a local land use board's decision. We resolve this question by adopting a burden-shifting analysis, in which the plaintiff bears the initial burden of showing that its requested accommodations are "necessary to afford [handicapped] person[s] [an] equal opportunity to use and enjoy a dwelling," 42 U.S.C. S 3604(f)(3)(B), at which point the burden shifts to the defendant to show that the requested accommodations are unreasonable.

3

In the present case, we conclude that the plaintiff has failed to produce sufficient evidence that the accommodations that it requested were "necessary" to afford the handicapped an "equal opportunity" to housing, and that the Board has shown that the requested accommodations were unreasonable, largely because of the problems with traffic safety and emergency vehicle access that the proposed Facility was likely to cause. We therefore affirm the District Court's grant of summary judgment to the defendants on the reasonable accommodations claim. We also affirm the District Court's judgment on the discriminatory impact claim, because we agree that Lapid has failed to establish a prima facie case that Scotch Plains's ordinances have a discriminatory impact on the elderly handicapped.

I. Facts & Procedural History

On June 9, 1998, Lapid applied to the Zoning Board of Adjustment of the Township of Scotch Plains, New Jersey for the variances and site plan approval necessary to build a long-term care facility for the elderly ("the Facility"). The proposed Facility included 35 beds in a skilled nursing section, the license for which Lapid wished to transfer from its nursing home in nearby Plainfield, New Jersey, and 60 "assisted living" beds, for which Lapid had originally received a license in Westfield, New Jersey. Lapid proposed to build the Facility on two contiguous lots, 1290 and 1310 Martine Avenue. At the time it applied to the Board, Lapid owned one of the lots in question and was under contract to purchase the other. The lots, which at the time the suit began held two single-family houses, would together provide 4.17 acres on which Lapid proposed to build a 58,034 square foot building (with a footprint of 27,640 square feet). Approximately 45% of the lots, or 1.9 acres, was covered by freshwater wetlands and wetland transition areas as defined by New Jersey's Freshwater Wetland Protection Act, N.J.S.A. 13:9B-1 et seq., and was therefore not available for construction.

The Martine Avenue lots are located in an area that is zoned R-1 under Scotch Plains's 1976 Master Plan. The R-1 zone is designated to permit only single-family houses on

4

large lots (40,000 square feet or more -- about an acre), with wide street frontage (a minimum width of 160 feet). However, several institutional uses exist in the R-1 zone around the lots where Lapid proposed to develop the Facility. These include a synagogue, a high school, a YMCA, and a country club.

In order to get approval to build the Facility, Lapid needed the Board to grant several variances, which it applied for on June 9, 1998. Lapid's application requested three approvals from the Board. First, because the land use that Lapid proposed (i.e., a residential care facility for the elderly), did not fit within the uses permitted in an R-1 zone, Lapid asked for a use variance pursuant to N.J.S.A. 40:55D-70(d). Second, Lapid requested three non-use variances pursuant to N.J.S.A. 40:55D-70(c). These sought permission to: (1) construct a parking lot in front of the building; (2) build a fence in excess of four feet in height; and (3) place a freestanding sign in front of the building. All of these are prohibited in residential areas and require a variance. Third, Lapid sought approval for its site plan.

The Board held four public hearings on Lapid's application -- on February 4, March 4, March 15, and March 24, 1999. Lapid presented testimony from various experts at these meetings, including Julius Szalay, an engineer; Stephen Crystal, a gerontologist; Peter Steck, a planner; David Horner, a traffic consultant; and Joseph Martin, a real estate appraiser. The Board received written reports from the Township's experts, Susan Kimball, a planner; Paul Ferriero, an engineer; Harold Maltz, a traffic consultant; Fire Chief Jonathan Ellis; Police Chief Thomas O'Brien; and Sergeant James Rau, the head of the police department's traffic safety bureau. Several of these officials also testified at the Board's public hearings.

Lapid's engineer made multiple amendments to the site plan in order to address the concerns that the Board and its experts raised. In particular, these concerns focused on the layout of the parking lot and its effect on traffic safety both within the Facility's lot and at the point of ingress and egress on Martine Avenue, as well as on the access that emergency vehicles would have to the rear of the building. In order to address the issues of emergency vehicle access,

5

Lapid's planner sought to meet with the Township's fire chief beginning on March 10, 1999, but was unable to do so until March 22, two days before the Board's final meeting at which it considered Lapid's variance and site plan applications.[1] Lapid did not address the fire chief 's latest concerns in a revised site plan prior to the March 24 meeting, and it requested bifurcation of its applications, i.e., it sought a decision on its variance application on March 24, but requested the Board's approval for an extension on its site plan application. The Board denied Lapid's request to bifurcate, and denied the entire application on the record before it at the March 24 meeting.

The Board then issued a written denial of Lapid's applications. The Board cited the following concerns as its reasons for denying the variances and site plan: (1) a negative impact on the municipal zoning plan (i.e., siting a commercial use in the R-1 zone); (2) traffic safety concerns, including increased traffic on Martine Avenue and hazards resulting from ingress and egress from the Facility's lot; (3) a substantial portion of the site contained wetlands; and (4) insufficient access for emergency and fire vehicles.

Lapid then filed a complaint in the District Court against the Board, the Township of Scotch Plains (together,"the municipal defendants"), Alta Rose, the person from whom Lapid had contracted to purchase the property at 1310 Martine Avenue, and her daughter Barbara Horev, who held a durable power of attorney for Rose's benefit. [2] The

_____

1. When Lapid's representatives finally met with Fire Chief Ellis, he was unable to give them specific details regarding the turning radius required by the department's largest trucks, in particular, the "tower ladder" truck. Ellis had previously raised the concern that the emergency vehicle access lane that Lapid proposed could not accommodate the tower ladder truck.

2. On March 31, 1999, Rose, through her daughter, Horev, terminated her contract with Lapid. On April 29, 1999, Rose filed suit in New Jersey Superior Court, Chancery Division, seeking a declaratory judgment that the termination was valid. The Superior Court ruled in her favor. Lapid appealed this decision, but withdrew its appeal on June 15, 2000, at which point the New Jersey Appellate Division entered an order dismissing the appeal. The District Court in this case dismissed Lapid's

6

complaint alleged that: (1) the Board's denial of Lapid's application for variances and site plan approval violated the FHAA's requirement that municipalities "make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [handicapped] person[s] [an] equal opportunity to use and enjoy" housing, 42 U.S.C. S 3604(f)(3)(B); (2) the Township's zoning ordinances violated the FHAA, S 3604(f), by having an adverse disparate impact on the elderly handicapped; (3) the denial violated the New Jersey Constitution and New Jersey's Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 et seq.; (4) the denial violated the Equal Protection and Due Process clauses of the Fourteenth Amendment to the U.S. Constitution, and article I, section I of the New Jersey Constitution; and (5) Rose and Horev violated their contractual obligations.3

Following discovery, the municipal defendants moved for summary judgment, which the District Court granted as to all counts. Lapid raises three questions on appeal: (1) whether the District Court erred by limiting its review of the reasonable accommodations claim to the materials that were before the Board (i.e., whether the District Court

_____

claims against Rose and Horev as a result of the state court decision, and Lapid does not appeal the dismissal. Rose subsequently sold her property to the adjacent YMCA, and therefore Lapid seeks only punitive and compensatory damages, and declaratory judgment that its rights were violated (not an order directing the Board to approve its specific site plan), because it cannot develop the Facility without the land that Rose sold to the YMCA.

3. Plaintiffs may bring three different types of claims against municipal land use authorities under the FHAA: (1) intentional discrimination claims (also called disparate treatment claims); (2) disparate impact claims; and (3) claims that the municipal authority failed to "make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford[handicapped] person[s] [an] equal opportunity to use and enjoy a dwelling." 42 U.S.C. S 3604(f)(3)(B); see also Gamble v. City of Escondido, 104 F.3d 300, 304-07 (9th Cir. 1997) (describing the three different causes of action available to plaintiffs under the FHAA). In this case, Lapid brings only disparate impact and "failure to make reasonable accommodations" claims.

7

should have allowed Lapid to supplement the administrative record); (2) whether summary judgment was proper on the claim that the Board violated the FHAA by failing to make reasonable accommodations under 42 U.S.C. S 3604(f)(3)(B); and (3) whether summary judgment was proper on the issue of whether the zoning ordinances of Scotch Plains have a disparate impact on the elderly handicapped in violation of 42 U.S.C. S 3604(f). The District Court had jurisdiction based on 28 U.S.C. S 1331 and 42 U.S.C. S 3613(a); it exercised supplemental jurisdiction over the state law claims. This court has jurisdiction pursuant to 28 U.S.C. S 1291. We review de novo the District Court's grant of summary judgment, see Woodside v. School Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001), under the familiar standard set forth in the margin.4

II. Failure to Make Reasonable Accommodations
      Under 42 U.S.C. S 3604(f)(3)(B) --
      Extent of the Record on Review, and
      Burdens of Proof

Lapid relies on 42 U.S.C. S 3604(f)(3)(B) for its claim that the Board failed to make reasonable accommodations as required under that section when it denied Lapid's request for variances and site plan approval. The FHAA, 42 U.S.C. S 3604(f), requires local land use boards to make "reasonable accommodations in rules, policies[and] practices" when reviewing proposals for housing for the handicapped. It provides in pertinent part that:

      [I]t shall be unlawful --

      (f)

      (1) To discriminate in the sale or rental, or to

_____

4. Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The judge's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of --

  (A) that buyer or renter,

  (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

  (C) any person associated with that buyer or renter.

  . . . .

(3) For purposes of this subsection, discrimination includes --

  . . . .

(B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling . . . .

42 U.S.C. S 3604.

Lapid contends that by denying its variance and site plan applications, the Board refused to make reasonable accommodations to facilitate the construction of housing for the elderly handicapped, thereby violating the FHAA. Before addressing the question whether summary judgment was proper on the reasonable accommodations claim, we must first address the proper scope of the record on review when hearing a reasonable accommodations challenge to a local land use decision brought under the FHAA, and the burdens of proof applicable to such a challenge.

A. Was it Error for the District Court to
       Limit its Review to the Materials That Were
       Before the Board?

Lapid submits that the District Court erred by limiting its review to the materials that were in the administrative record before the Board. Lapid asked the District Court for permission to supplement the administrative record for the purpose of litigating its reasonable accommodations claim, but the Court refused, holding that it "must review the

9

Zoning Board's decision based solely on the record below." Lapid's argument that it was error for the District Court to limit its review to the materials that were before the Board is grounded on its contentions that the Board and its experts failed to engage in an "informal interactive process" with Lapid and its engineer, and that it committed procedural error by refusing to allow Lapid to bifurcate its variance and site plan applications. Lapid contends that when a local land use board fails to engage in such a process, a court reviewing an FHAA challenge to the local board's decision should allow the plaintiff to supplement the administrative record.

Lapid points to two sources for the "interactive process" requirement that it suggests exists. First, Lapid argues that because the reasonable accommodations provision in the FHAA is modeled on the Rehabilitation Act of 1973, 29 U.S.C. S 701 et seq., a duty of the Board to communicate and cooperate in good faith should be imported from this court's Rehabilitation Act jurisprudence and grafted onto our FHAA jurisprudence. Second, Lapid argues that "New Jersey law . . . requires a similar interactive process." In view of these contentions, we must address the questions: (1) whether the District Court reached the correct legal conclusion that courts reviewing FHAA reasonable accommodations challenges to zoning board decisions should ordinarily limit their review to the record before the zoning board; and (2) whether there is an additional "interactive process" requirement, which the Board in this case failed to meet, that would require a reviewing court to look outside the administrative record.

1. Should a Court Reviewing an FHAA Reasonable Accommodations Challenge to an Adverse Decision from a Local Land Use Board Limit Its Review to the Administrative Record?

Although we have not previously addressed the issue of the proper scope of review for a federal court reviewing an FHAA reasonable accommodations challenge to a decision of a local land use board, we are convinced that federal courts should limit their review to the materials that were presented to the local land use board, except in

circumstances where the board prevents applicants from presenting sufficient information.

To support its conclusion that a reviewing court should not look outside the record when reviewing an FHAA reasonable accommodations challenge to a local land use decision, the District Court cited Keys Youth Services, Inc. v. City of Olathe, 75 F. Supp. 2d 1235 (D. Kan. 1999), which was later affirmed in relevant part by the Tenth Circuit, 248 F.3d 1267 (10th Cir. 2001). In Keys Youth Services, a nonprofit organization (Keys) sought a variance that it needed to establish a group home in a single-family home in Olathe, Kansas for ten youths who had been abused, neglected, or abandoned. After the local land use board twice denied Keys's application for a variance, Keys sued in federal court, alleging that the board had violated the FHAA's reasonable accommodations requirement when it refused to grant the variance. The district court granted judgment as a matter of law to the City of Olathe on the reasonable accommodations claim because it found that Keys had failed to present evidence to the local zoning board that the requested accommodation was necessary. While the court concluded that Keys might have been able to show that a minimum of 10 residents was required for its group home's financial viability, it found that Keys had failed to present any evidence of this necessity to the local zoning board.

The Tenth Circuit affirmed the district court's judgment on the reasonable accommodations claim based "on the principle that Olathe cannot be liable for refusing to grant a reasonable and necessary accommodation if the City never knew the accommodation was in fact necessary." Keys Youth Services, 248 F.3d at 1275. The court held that plaintiffs should be required to present all of the evidence they have that would justify why an accommodation is necessary under the FHAA to the local land use board, and that a reviewing court should not look outside the administrative record.

The Fourth Circuit adopted the same position in Bryant Woods Inn, Inc. v. Howard County, 124 F.3d 597 (4th Cir. 1997), an FHAA reasonable accommodations challenge brought by a non-profit group home for adults suffering

11

from Alzheimer's Disease that was seeking to expand its number of residents from 8 to 15. In Bryant Woods, the court refused to look beyond the administrative record and affirmed the district court's grant of summary judgment in favor of Howard County because the non-profit group had failed to present evidence to the local land use board that the expansion was "necessary" within the meaning of the FHAA. Id. at 605-06.

We join the Tenth and Fourth Circuits in holding that courts hearing reasonable accommodations challenges should ordinarily limit their review to the administrative record. This rule permits local land use boards to have the initial opportunity to provide reasonable accommodations to facilitate housing for the handicapped; it also comports with the tradition in American law that land use decisions are quintessentially local in nature. See, e.g. , FERC v. Mississippi, 456 U.S. 742, 768 n.30 (1982) ("[R]egulation of land use is perhaps the quintessential state activity."); Village of Belle Terre v. Boraas, 416 U.S. 1, 13 (1974) (Marshall, J., dissenting) (noting that zoning "may indeed be the most essential function performed by local government"). We too have recognized in similar contexts the value of local authorities resolving such matters on their own without interference from the federal courts. See Acierno v. Mitchell, 6 F.3d 970 (3d Cir. 1993) (stating that courts should not insert themselves in "delicate area[s]," subject to local regulation until local authorities have "had the opportunity to apply authoritatively" their specific regulations).

Notwithstanding the foregoing, we point out that it may be necessary for a court reviewing an FHAA reasonable accommodations claim to look outside of the administrative record when a land use board either intentionally or inadvertently prevents an applicant from presenting the evidence necessary to support an FHAA reasonable accommodations claim.5 Lapid asserts that the Board's

(Text continued on page 14)

_____

5. As is clear from the text, our holding that courts reviewing reasonable accommodations challenges to local land use decisions brought under the FHAA should ordinarily limit their review to the administrative record assumes that plaintiffs who bring reasonable accommodations claims

12

against localities must usually first seek redress through variance applications to the local land use authority. That holding is therefore in tension with some district court decisions from within this Circuit (including one that we affirmed summarily) that hold that in some circumstances a plaintiff need not first apply for a variance in order to bring an FHAA reasonable accommodations claim. See Horizon House Dev. Servs., Inc. v. Township of Upper Southampton , 804 F. Supp. 683 (E.D. Pa. 1992) (allowing a plaintiff to bring an FHAA reasonable accommodations challenge to a local zoning ordinance without first seeking a variance from a local land use board), judgment aff 'd without op., 995 F.2d 217 (3d Cir. 1993); Assisted Living Assocs. of Moorestown, L.L.C. v. Moorestown Township, 996 F. Supp. 409, 425–28 (D.N.J. 1998) (same). But see Marriott Senior Living Servs., Inc. v. Springfield Township,
78 F. Supp. 2d 376, 385–86 (E.D. Pa. 1999) ("While strict compliance with every local ordinance or regulation is not required . . . the applicant
must show that under the circumstances it has afforded the appropriate local authority a reasonable opportunity to consider the project in some final form."); Community Interactions -- Bucks County, Inc. v. Township of Bensalem, 1994 WL 702943, 8 A.D.D. 276 (E.D. Pa. 1994) (dismissing an FHAA suit because the plaintiff failed to seek a variance with the local
land use board). In the cases where district courts heard FHAA claims without requiring the plaintiff to have first sought a variance with a local
land use authority, the reviewing court necessarily had to consider materials from outside the nonexistent administrative record.

Although we are not bound by the district court cases cited above, including the case that we summarily affirmed, (summary affirmances are non–precedential, see 3d Cir. I.O.P. 6.2.1), and we are not presented with and do not reach questions of ripeness or exhaustion in this case, we note that the position adopted by the Seventh and Eighth Circuits on when plaintiffs bringing FHAA reasonable accommodations challenges against localities must first apply for variances with local land use boards rationalizes these cases (which allowed plaintiffs to bring reasonable accommodations claims without first seeking a variance) with the necessary implication of our holding today (that most reasonable accommodations claims must first be presented to local land use boards). In United States v. Village of Palatine , 37 F.3d 1230 (7th Cir. 1994), the Seventh Circuit reviewed an FHAA reasonable accommodations challenge to a local ordinance for which the plaintiff had not sought a variance. The court held that the claim was not ripe, and that in general a city must be afforded the opportunity to make the requested accommodation. Id. at 1233. However, the court identified two exceptions where the claim would be ripe even if the plaintiff had not

13

denial of its request to bifurcate its variance and site plan applications was unreasonable and in violation of New Jersey's Municipal Land Use Law, and prevented it from presenting materials relevant to its reasonable accommodations claim. In particular, Lapid argues that it had a statutory right to bifurcate its applications at any point during the application review procedure pursuant to N.J.S.A. 40:55D-76(b), which provides that "[t]he developer may elect to submit a separate application requesting approval of the variance and a subsequent application for any required approval of a subdivision, site plan or conditional use." Therefore, contends Lapid, the District Court should have granted Lapid's request to supplement the administrative record.

The Board responds that its denial of Lapid's variance and site plan applications at the March 24 meeting was merely the result of Lapid's refusal to consent to an extension on both applications, which it had the power to do pursuant to N.J.S.A. 40:55D-76(c). The Board further submits that even if it had granted the request to bifurcate, it could not have meaningfully evaluated Lapid's variance application without reference to the specific problems that the Board had identified with the site plan application. In other words, the Board argues that Lapid essentially forced it to review its site plan application as it existed at the March 24 meeting by not consenting to an extension on both the variance and site plan applications. Therefore, the argument continues, Lapid cannot now complain that the Board prevented it from presenting all of the information necessary to support its reasonable accommodations claim.

_____

first sought a variance from the local land use board: (1) if the claim were a challenge to the variance application procedure itself; and (2) if the variance application process was demonstrably futile. Id. at 1234. The Village of Palatine court also limited the ripeness rule that it formed
to reasonable accommodations claims and noted that"if the plaintiff 's claim were of discriminatory intent, rather than failure to make a reasonable accommodation, th[e] claim might well be presently ripe even though [the plaintiff] has not sought a special use approval." Id. at 1233 n.3. The Eighth Circuit has followed the Seventh Circuit's ripeness rule for FHAA reasonable accommodations claims. See Oxford House-A v. City of Univ. City, 87 F.3d 1022, 1024-25 (8th Cir. 1996).

14

New Jersey's Municipal Land Use Law provides that local zoning boards must act on an application for a variance or site plan approval within 120 days of when a complete application is submitted. If a zoning board fails to act within the statutory period, the application is deemed granted by force of law. See N.J.S.A. 40:55D-73(b). However, an applicant may consent to the extension of this 120-day period. See N.J.S.A. 40:55D-73(b); N.J.S.A. 40:55D-76(c). In the present case, Lapid's counsel agreed to extend the Board's deadline once to April 1, 1999. Instead of offering to extend the deadline again, Lapid sought to bifurcate its applications and to require the Board to vote on the variance application before April 1 or to have it approved by force of law.

Lapid contends that by requesting to bifurcate its application, it was offering to extend the time limit for the site plan application, and resting its case only on the variance application. Because of New Jersey's statutory scheme governing the evaluation of variance applications, however, we agree that the Board could not have meaningfully considered the variance application without reference to the specific problems that it had identified in the site plan application and Lapid's proposed solutions to these problems, and that the offer to extend time for consideration of the site plan application was therefore essentially meaningless.

The section of the MLUL that governs applications for use variances, N.J.S.A. 40:55D-70(d), requires an applicant to establish that certain positive and negative criteria are fulfilled in order to have the variance granted. See Smart SMR of N.Y., Inc. v. Borough of Fair Lawn Bd. of Adjustment, 704 A.2d 1271, 1278 (N.J. 1998). To establish the positive criteria, the applicant generally must show " `special reasons' for the grant of the variance." Sica v. Bd. of Adjustment of the Township of Wall, 603 A.2d 30, 32 (N.J. 1992). The "negative criteria require proof that the variance `can be granted without substantial detriment to the public good' and that it will not substantially impair the intent and purpose of the zone plan and zoning ordinance." Id. (quoting N.J.S.A. 40:55D-70(d)). When the variance application seeks permission for an "inherently beneficial

15

use," as it does in this case, the application presumptively satisfies the positive criteria. See Smart SMR , 704 A.2d at 1278. The New Jersey Supreme Court has instructed that when evaluating a variance application for an inherently beneficial use, a zoning board must identify and"weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good." Id. at 1279 (quoting Sica, 603 A.2d at 37).

The potential negative criteria relating to the use variance that Lapid sought in this case are directly related to its proposed site plan. In denying the application, the Board relied on concerns about traffic safety and emergency vehicle access. These issues certainly go to the question whether the variance would cause "substantial detriment to the public good." N.J.S.A. 40:55D-70(d). Further, the size of the proposed Facility, another expressed concern, goes to the question whether granting the variance would "substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70(d). Therefore, even assuming that it was error to deny the bifurcation, we do not see how the Board could have considered the negative statutory criteria that it was required to consider without reference to the site plan application as it existed when the Board denied the application.6 Lapid argues that a zoning board can consider a variance application with stipulated or hypothetical conditions on a site plan that will be considered subsequent to the approval of the variance application. To be sure, this may be feasible and desirable in some cases. We do not see, however, how it would have been feasible in the present case.

Most importantly, we agree with the District Court that "based on a reading of the Zoning Board's hearing on the matter, it appears that Lapid-Laurel was given a full and

_____

6. We do not address the question whether the Board committed procedural error under the MLUL that would require its decision to be reversed. That would be an issue appropriate for direct appeal to the New Jersey courts, and, at all events, Lapid did not present it to the District Court or this court.

16

fair opportunity to present its case before the Zoning Board. Over the course of four hearings, Lapid . . . presented five witnesses and various exhibits." Indeed, as the District Court noted, "[p]laintiff 's counsel even conceded at oral argument that the Board in no way prevented plaintiff from presenting any and all evidence it wished to advance." Therefore, we do not think that the Board's denial of Lapid's request to bifurcate its applications shows that the Board prevented Lapid from presenting the necessary evidence to support its FHAA claim, nor does it provide a sufficient reason for this court to look outside the administrative record when reviewing Lapid's reasonable accommodations claim.

2. Does the FHAA or New Jersey Law Require a
        Local Land Use Board to Engage in an "Informal
        Interactive Process" with a Developer?

Lapid argues that the FHAA itself, or alternatively New Jersey's MLUL, imposes an affirmative obligation on local land use boards to engage in an "informal interactive process" with variance applicants. Lapid argues that the Board in this case failed to engage in that process (citing in particular the inability of Lapid's representatives to meet with Fire Chief Ellis when they wanted to do so), and that therefore it is appropriate for a reviewing federal court to look at materials from outside the administrative record. For the following reasons, we do not think that any such "informal interactive process" requirement exists.

Lapid argues that because the language of the FHAA's reasonable accommodations requirement was borrowed from the Rehabilitation Act of 1973, 29 U.S.C. S 701 et seq., and that because this court has held that under the Rehabilitation Act, a defendant employer has "a duty to make reasonable efforts to assist [an employee,] to communicate with him in good faith," Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997), a local land use board has a similar duty under the FHAA to engage in an "informal interactive process" with a developer seeking a variance on behalf of the handicapped.

Mengine involved a Rehabilitation Act challenge brought by a Postal Service employee, alleging that the Service had

17

failed to provide reasonable accommodations by failing to move him to a position other than letter carrier after he became disabled and incapable of fulfilling the duties of that position. Relying on Beck v. University of Wisconsin, 75 F.3d 1130 (7th Cir. 1996), an analogous case from the Seventh Circuit that involved a claim brought under the Americans with Disabilities Act (ADA), Mengine held that "both parties [i.e., the employer and the employee] have a duty to assist in the search for [an] appropriate reasonable accommodation." 114 F.3d at 420.

Beck involved a similar claim brought by a disabled employee under the ADA against her employer for failing to provide reasonable accommodations for her disability. In Beck, the court specifically relied on 29 C.F.R.S 1630 (1995), a regulation promulgated pursuant to the ADA, to reach its conclusion that "[t]he appropriate accommodation" for an employer to provide "is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." Beck, 75 F.3d at 1135 (quoting 29 C.F.R. S 1630, app. (1995)) (internal quotation marks omitted). Although we recognized in Mengine that 29 C.F.R. S 1630 technically applies only to the ADA, we found that Beck was "relevant to our analysis of the Rehabilitation Act because in 1992 the Rehabilitation Act was amended to incorporate the standards of several sections of the ADA, including the section defining `reasonable accommodation.' " Mengine, 114 F.3d at 420. We have elaborated on the interactive process in later cases. See Donahue v. Consol. Rail Corp., 224 F.3d 226, 234 (3d Cir. 2000).

The FHAA borrows language from the Rehabilitation Act. See Hovsons, Inc. v. Township of Brick, 89 F.3d 1096, 1101 (3d Cir. 1996). However, the FHAA and the Rehabilitation Act do not bear the significant similarities that justified importing the requirements of 29 C.F.R. S 1630 from the ADA to the Rehabilitation Act. The informal interactive process that S 1630 describes applies specifically to an employer-employee relationship. The regulation was promulgated to apply in the employment context, and it is highly doubtful that it was ever contemplated that it would apply in the very different context of housing and land use

18

regulations. Moreover, we believe that it would be particularly inappropriate to impose it on local land use boards because they already face detailed state and municipal requirements mandating formal procedures, which, at least in some cases, prohibit them from engaging in informal, off-the-record negotiations with variance applicants. See N.J.S.A. 40:55D-10 (requiring that local zoning boards hold hearings for variance applications at which testimony is given under oath and produce written resolutions that contain findings of fact and legal conclusions based on these hearings); see also Commons v. Westwood Zoning Bd. of Adjustment, 410 A.2d 1138, 1145 (N.J. 1980) (noting that the New Jersey Supreme Court "ha[s] frequently advised boards of adjustment to make findings predicated upon factual support in the record").7 Therefore, we hold that notwithstanding the "interactive process" requirement that exists in the law of this court in the employment context under the Rehabilitation Act, see Mengine, 114 F.3d at 420, the FHAA imposes no such requirement on local land use authorities.

Lapid also argues that New Jersey law requires local zoning boards to engage in an informal interactive process with developers who apply for site plan approvals. To support this proposition, Lapid cites the following language from Pizzo Mantin Group v. Township of Randolph , 645 A.2d 89 (N.J. 1994):

> Although a planning board is not required affirmatively to propose suggested revisions and modifications of a subdivision plan or site plan, the MLUL [Municipal Land Use Law] contemplates active involvement by planning boards in their review of subdivisions. The generalized design standards for subdivision ordinances prescribed by the MLUL necessarily invoke the planning board's expertise and familiarity with local conditions and implicate the exercise of discretion by planning boards. . . . That discretion is best

_____

7. By imposing an "informal interactive process" on land use boards, we would also be compromising the important policies underlying state law limitations on off-the-record contacts between developers and board members, such as limiting the potential for corruption of local officials.

19

> exercised by a process in which planning boards
> affirmatively interact with developers when reviewing
> proposed subdivisions.

Id. at 98 (emphasis added) (citation omitted). We do not agree that Pizzo Mantin imposes a requirement that local land use boards engage in an informal interactive process with developers. First, the language in the case says that how a board interacts with a developer is a matter of discretion that is "best exercised" when "planning boards affirmatively interact with developers." Id. at 233. This language is far from mandatory. Second, it is unclear how, if the Scotch Plains zoning board violated New Jersey's MLUL in this case, that should bear on the scope of review of a federal FHAA claim (unless in violating the MLUL, the Board prevented Lapid from presenting necessary evidence). To the extent that Lapid is attempting to argue its pendent state law claims, it is barred from doing so because it failed to raise these state law claims in this appeal.

It is generally beneficial for land use boards to be cooperative with developers, and we do not think that the Board engaged in model behavior toward Lapid in this case. Nevertheless, we cannot impose an interactive process requirement on the Board as a matter of law.

B. Burdens of Proof for Reasonable
Accommodations Claims

As noted above, Lapid relies on 42 U.S.C. S 3604(f)(3)(B) for its claim that the Board failed to make reasonable accommodations as required under that section when it denied Lapid's request for variances and site plan approval. The statute provides that it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap . . . ." 42 U.S.C. S 3604(f)(2). The statute defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." S 3604(f)(3)(B).

20

Hovsons, Inc. v. Township of Brick, 89 F.3d 1096 (3d Cir. 1996), is the only case in which we have addressed the legal framework of an FHAA reasonable accommodations claim. Hovsons focused mainly on the meaning of the "reasonable accommodations" part of S 3604(f)(3)(B), as opposed to the meaning and import of the terms "necessary" and "equal opportunity." The main question in Hovsons was which party carried the burden on the reasonableness issue, i.e., whether it is the plaintiff 's burden to show that the requested accommodation is reasonable, or the defendant's burden to show that it is not. Hovsons relied on our Rehabilitation Act cases to hold that it is the defendant's burden to show that the requested accommodation is unreasonable:

> Our precedents interpreting S 504 of the Rehabilitation Act have held that the burden of proving that a proposed accommodation is not reasonable rests with the defendant. See Juvelis v. Snider, 68 F.3d 648, 653 & n.5 (3d Cir. 1995); Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1385 (3d Cir. 1991). As we have already held that courts must look to the body of law developed under S 504 of the Rehabilitation Act as an interpretive guide to the `reasonable accommodations' provisions of the FHAA, we further hold that the burden should have been placed on the [defendant] [t]ownship . . . to prove that it was either unable to accommodate [the plaintiff] or that the accommodation . . . proposed was unreasonable.

Hovsons, 89 F.3d at 1103. At least three Courts of Appeals disagree with our position on which party has the burden on the issue of reasonableness. See Groner v. Golden Gate Garden Apartments, 250 F.3d 1039, 1045 (6th Cir. 2001) ("[W]e conclude that the plaintiff in a Fair Housing Act case has the burden of proof to establish the reasonableness of a proposed accommodation."); Bryant Woods Inn, Inc. v. Howard County, 124 F.3d 597, 603-04 (4th Cir. 1997) (holding that it is the plaintiff 's burden to show that the requested accommodation is reasonable); Elderhaven, Inc. v. City of Lubbock, 98 F.3d 175, 178 (5th Cir. 1996) ("[W]e reject the suggestion of certain courts that a Fair Housing Act defendant bears the burden of proof on the question of reasonableness.") (citing Hovsons).

21

Although Hovsons discussed only the "reasonableness" part of the statute, the Township contends that the plaintiffs were also required to show that the requested accommodations were "necessary to afford . . .[an] equal opportunity" to the handicapped. 42 U.S.C. S 3604(f)(3)(B). We agree that the plain language of the statute requires us to focus on all three factors, i.e., whether the requested accommodation is "(1) reasonable and (2) necessary to (3) afford handicapped persons an equal opportunity to use and enjoy housing." Bryant Woods Inn, 124 F.3d at 603. Therefore, we must determine which party carries the burden of demonstrating these issues. We are bound by Hovsons's holding that the defendant bears the burden of showing that the accommodation is unreasonable, but because Hovsons did not decide which party has the burden of showing that the requested accommodation is necessary to afford handicapped persons an equal opportunity to housing, we must decide these issues. We think that under S 3604(f)(3)(B) the plaintiff bears the initial burden of showing that the requested accommodation is necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling, at which point the burden shifts to the defendant to show that the requested accommodation is unreasonable.

We believe that this approach makes more sense and more closely comports with the likely intent of Congress than the approach of placing the burden on the defendant to show both (1) that the requested accommodation is not necessary to create an equal opportunity for housing; and (2) that it is unreasonable. We initially note that the Rehabilitation Act cases on which Hovsons relied provide no guidance on the issue of who should bear the burden on factors other than reasonableness. In fact, they provide little analysis even on the issue of who should bear the burden on reasonableness. See Juvelis v. Snider , 68 F.3d 648, 653 n.5 (3d Cir. 1995) (stating without discussion that "the burden is on [the defendant] to demonstrate that adjusting its requirements would fundamentally alter the program or impose an undue burden on the department"); Nathanson v. Med. College of Pa., 926 F.2d 1368, 1385 (3d Cir. 1991) (same). But see McGregor v. La. State Univ. Bd. of Supervisors, 3 F.3d 850, 859 n.11 (5th Cir. 1993)

22

(holding that S 504 of the Rehabilitation Act imposes the burden of proof as to reasonableness on the plaintiff).

Because the cases on which Hovsons relied to place the burden on the reasonableness issue on the defendant do not provide any guidance as to where the burden should be placed on the other issues (that would be analogous to the "necessary" and "equal opportunity" elements of S 3604(f)(3)), and because "the FHA[A]'s text evidences no intent to alter normal burdens" from the plaintiff to the defendant, Bryant Woods Inn, 124 F.3d at 603-04, we must determine whether Congress intended to place the burden on the issue of whether the requested accommodation is "necessary to create an equal opportunity" on the plaintiff or the defendant. We think that a burden-shifting approach in which the plaintiff would first have the burden of demonstrating that the requested accommodation is necessary to create an equal opportunity, at which point the burden would shift to the defendant to show that the accommodation is unreasonable, makes sense from a policy standpoint.

While a plaintiff is in the best position to show what is necessary to afford its clients (i.e., the handicapped population that it wishes to serve) an equal opportunity to use and enjoy housing, a defendant municipality is in the best position to provide evidence concerning what is reasonable or unreasonable within the context of its zoning scheme. This burden-shifting approach is also consistent with the approach that courts have applied to intentional discrimination and disparate impact claims brought under 42 U.S.C. S 3604(f), the two other types of FHAA claims available against local land use boards in addition to reasonable accommodations claims. See 148 A.L.R. Fed. 1, 53, S 3[e] (1998) ("The courts tend to follow a burden-shifting approach in determining whether a defendant's conduct is violative of 42 U.S.C.A. S 3604(f).. . . [O]nce the plaintiff has established a prima facie case of housing discrimination under the statute, . . . the burden shifts to the defendant to demonstrate a legitimate nondiscriminatory reason for its conduct or, in the case of a governmental defendant, to show that its actions furthered a legitimate, bona fide governmental interest, and

23

that no alternative would serve that interest with less discriminatory effect. Once the defendant has made such a showing, the burden shifts to the plaintiff to establish that the reason asserted by the defendant is merely a pretext for discrimination."); see also Stephenson v. Ridgewood Village Apartments, 1994 WL 792581, 8 A.D.D. 414 (W.D. Mich. 1994) (applying a 3-step burden-shifting analysis to claims of intentional discrimination brought under 42 U.S.C. S 3604). Because it makes sense from a policy standpoint and is consistent with courts' interpretation of other claims brought under the FHAA, we conclude that Congress intended to place on the plaintiff the burden of showing that a requested accommodation is "necessary" to give the handicapped an "equal opportunity" to use and enjoy housing.

In sum, we read S 3604(f)(3) to require a burden-shifting analysis in which the initial burden is on the plaintiff to demonstrate that the accommodations that it requested are "necessary to afford [handicapped] persons[an] equal opportunity to use and enjoy a dwelling," 42 U.S.C. S 3604(f)(3)(B), at which point the burden shifts to the defendant to show that the requested accommodations are unreasonable.

III. Was Summary Judgment Proper on the Reasonable Accommodations Claim?

In order to evaluate the District Court's grant of summary judgment to the municipal defendants on the reasonable accommodations claim, we must determine whether there is a genuine issue of material fact regarding: (1) whether the accommodations that Lapid requested were necessary to afford handicapped persons an equal opportunity to use and enjoy housing; and, if so (2) whether the accommodations requested were unreasonable.

As an initial matter, there are two points on which the parties agree or that are settled beyond dispute with respect to the reasonable accommodations claim: (1) that the future residents of the Facility that Lapid proposed to build would be handicapped within the meaning of Section 3604(f), see Hovsons, 89 F.3d at 1103 n.3; and (2) that a

24

nursing home like the one that Lapid proposed qualifies as a "dwelling" within the meaning of the statute, see id. at 1102.

A. Did Lapid Demonstrate That the Accommodations
       it Requested Were Necessary to Afford Elderly
       Handicapped Persons an Equal Opportunity to Use
       and Enjoy Housing?

As noted above, we have not previously addressed the "necessity" and "equal opportunity" factors of a S 3604(f)(3)(B) claim. The Courts of Appeals that have provided the most discussion of the meaning of these terms in the FHAA are the Sixth and Fourth Circuits. The key to their analysis is that the plaintiff in an FHAA reasonable accommodations case must establish a nexus between the accommodations that he or she is requesting, and their necessity for providing handicapped individuals an"equal opportunity" to use and enjoy housing.

In Smith & Lee Associates, Inc. v. City of Taylor, 102 F.3d 781 (6th Cir. 1996), an FHAA challenge by a residential facility for Alzheimer's patients to the city's denial of its application to expand its facility from 6 to 12 patients, the Sixth Circuit discussed the meaning of "necessity" and "equal opportunity" in S 3604(f)(3)(B). Turning first to the meaning of "equal opportunity," the court cited the House Report on the Act, which states that the FHAA was designed to " `end the unnecessary exclusion of persons with handicaps from the American mainstream.' " 102 F.3d at 794 (quoting H.R. Rep. No. 711, 100th Cong., 2d Sess. 18, reprinted in 1988 U.S.C.C.A.N. 2173, 2179). From this, the court concluded that the FHAA defines "equal opportunity . . . [to] giv[e] handicapped individuals the right to choose to live in single-family neighborhoods, for that right serves to end the exclusion of handicapped individuals from the American mainstream." Id . at 794-95; see also Bryant Woods Inn, Inc. v. Howard County, 911 F. Supp. 918, 946 (D. Md. 1996) ("[T]he Act prohibits local governments from applying land use regulations in a manner that will exclude people with disabilities entirely from zoning neighborhoods, particularly residential neighborhoods, or that will give disabled people less

25

opportunity to live in certain neighborhoods than people without disabilities."), aff 'd 124 F.3d 597 (4th Cir. 1997).

Next turning to the meaning of "necessary," the Smith & Lee court concluded that in order to show that a requested accommodation is "necessary" plaintiffs "must show that, but for the accommodation, they likely will be denied an equal opportunity to enjoy the housing of their choice." 102 F.3d at 795. The Fourth Circuit also defined the word "necessary" to require a link between the proposed accommodation and the "equal opportunity" in question:

> The "necessary" element . . . requires the demonstration of a direct linkage between the proposed accommodation and the "equal opportunity" to be provided to the handicapped person. This requirement has attributes of a causation requirement. And if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be "necessary."

Bryant Woods Inn, 124 F.3d at 604.

Other courts have also recognized that the equal opportunity to live in a residential zone is valid under S 3604(f)(3)(B). See, e.g., Smith & Lee Assocs., 102 F.3d at 795 ("[E]lderly disabled citizens have a right to live in [a town's] single-family neighborhoods."). We agree. The "equal opportunity" that Lapid seeks to provide here is the opportunity for handicapped persons to live in a single-family residential neighborhood. Most of the accommodations that Lapid sought are geared toward getting exceptions from the stringent zoning requirements of Scotch Plains's R-1 zone.

With respect to the use variance, it is clear that Lapid demonstrated that a use variance was necessary to achieve an equal opportunity for the elderly handicapped to live in a residential area of Scotch Plains. This is true almost by definition. The elderly handicapped who need skilled nursing care usually are not able to live in their own houses. They must live in some sort of institutional setting in order to receive the assistance or health care that they need. No institutional health care facilities are permitted without a use variance in the neighborhoods zoned R-1

26

residential in Scotch Plains. Therefore, a use variance is
necessary for the elderly handicapped to have an equal
opportunity to live in a residential area of Scotch Plains.
Lapid's experts were explicit that one of the objectives of the
proposed Facility was to allow the elderly to live in a
predominately single-family residential zone. Dr. Stephen
Crystal, Lapid's gerontologist, expert gave the following
answer to a question that Lapid's lawyer asked him at one
of the Board's public hearings:

> Atty. Butler: ". . . Dr. Crystal, generally in your
> professional opinion, is it appropriate to site an
> assisted living nursing home in a residential zone?"
>
> . . . .
>
> Dr. Crystal: "There has been a lot of emphasis on long-
> term care, in trying to normalize long-term care,[and]
> bring[ing] people as much as possible into settings
> where they feel they are part of the mainstream and
> they feel they are not segregated. And I believe that's a
> benefit."

While we think it clear that the use variance that Lapid
requested was necessary to provide the elderly handicapped
an equal opportunity to live in a residential neighborhood,
it is a much closer question whether Lapid established that
the particular features of the site plan that it requested
were necessary to provide the elderly handicapped an equal
opportunity to live in a residential area of Scotch Plains. All
of the Board's site-plan-specific objections really seem to
boil down to the objection that the Facility (both the
building and the number of residents it would house) would
be too large for the site on which it was proposed and for
the surrounding neighborhood. A strict interpretation of the
"necessity" requirements of S 3604(f)(3)(B) would require
Lapid to show that a building of the size that it proposed is
required to provide the handicapped an equal opportunity
to live in a residential neighborhood.

Courts that have taken this approach have required a
plaintiff to show that the size of the proposed facility either
would be necessary for the facility's financial viability (and
therefore necessary to give the handicapped an equal
opportunity to live in a residential neighborhood) or would

27

serve a therapeutic purpose, (and would therefore be necessary to ameliorate an effect of the handicap). See Bryant Woods Inn, 124 F.3d at 605 (concluding that the plaintiff had failed to demonstrate why expanding its group home was necessary other than it would increase its profits, even though it was already making a sustaining profit); Smith & Lee Assocs., 102 F.3d at 788 (holding that the test to determine whether expansion of a group home was financially necessary was not whether "a particular profit-making company needs such an accommodation, but, rather do businesses as a whole need this accommodation") (citation and internal quotation marks omitted); see also Brandt v. Village of Chebanse , 82 F.3d 172, 174 (7th Cir. 1996) (noting that "some minimum size may be essential to the success" of group care facilities). We agree that the FHAA requires Lapid to show that the size of its proposed Facility is required to make it financially viable or medically effective.

Lapid presented some evidence on the therapeutic value served by the scale of its group home. Dr. Crystal, the gerontologist, testified that assisted living facilities above a certain size were less desirable from a therapeutic standpoint, and opined that he had observed that care facilities that contained between 80 and 100 beds"seem to work very well." Dr. Crystal did not testify, however, that care facilities for the elderly that are smaller than the proposed facility are unable to provide the range of care required or that it would be economically infeasible to operate a smaller facility. We therefore do not think that on the basis of Dr. Crystal's testimony regarding the therapeutic effectiveness of facilities of the size that Lapid was proposing, a reasonable jury could find that Lapid had shown that the specific features of its proposed facility (its size in particular) were "necessary to afford[handicapped] . . . person[s] [an] equal opportunity" to live in a residential neighborhood in Scotch Plains. 42 U.S.C. S 3604(f)(3)(B).8

_____

8. Lapid also asserts that it has necessarily shown that its requested accommodations were necessary because it was issued a Certificate of Need ("C.O.N.," i.e., a license), by the New Jersey Department of Health and Senior Services. Developers of healthcare facilities such as the one

But even if Lapid had presented sufficient evidence to create a triable issue of fact on whether the proposed facility was "necessary to afford [handicapped] . . . person[s] [an] equal opportunity" to live in a residential neighborhood in Scotch Plains, S 3604(f)(3)(B), the municipal defendants would be entitled to summary judgment on the alternative ground that the requested accommodations were unreasonable, which we explain below.

B. Did the Board Demonstrate That the Requested Accommodations Were Unreasonable?

In Hovsons, we established the legal framework for determining whether a requested accommodation is "reasonable" under 42 U.S.C. S 3604(f)(3)(B). We held that in order to "establish that the accommodation proffered by [the applicant] was not reasonable, [the municipality] [i]s required to prove that it could not have granted the variance without:" (1) "imposing undue financial and administrative burdens;" (2) "imposing an `undue hardship' upon the Township;" or (3) "requiring a fundamental alteration in the nature of the [zoning] program." Hovsons, 89 F.3d at 1104 (internal citations and quotation marks

_____

that Lapid proposed are required to apply for Certificates of Need pursuant to N.J.S.A. 26:2H-7. The municipal defendants argue that the C.O.N. is irrelevant to whether the proposed Facility is necessary under the FHAA because (1) the issuance of a C.O.N. by the DHSS "expresses no specific determination by the Department of Health of the need for any particular proposed facility"; and (2) the particular C.O.N. that Lapid
was issued was initially designated for a facility in Westfield, New Jersey,
and therefore has no bearing on a determination of Scotch Plains's need for a nursing home.

We agree with the Township that the State's issuance of the C.O.N. to Lapid is not material to the question whether the Facility that it proposed is "necessary" to provide an "equal opportunity" for the elderly handicapped to use housing in Scotch Plains. Even assuming that Lapid is correct that the DHSS certificate represents the State of New Jersey's conclusion that Union County is in need of additional assisted living and skilled nursing facilities, that alone does not establish a nexus between the requested accommodations, and their necessity to create an equal opportunity for the handicapped.

29

omitted). We cautioned that this inquiry is "highly fact-specific, requiring a case-by-case determination." Id. (quoting United States v. Cal. Mobile Home Park Mgmt. Co., 29 F.3d 1413, 1418 (9th Cir. 1994)). We also noted that "[w]e must review the reasonable accommodations requirement `in light of two countervailing legislative concerns: (1) effectuation of the statute's objectives of assisting the handicapped; and (2) the need to impose reasonable boundaries in accomplishing this purpose.' " Id. (quoting Americans Disabled For Accessible Pub. Transp. (ADAPT) v. Skinner, 881 F.2d 1184, 1191 (3d Cir. 1989) (en banc)). Thus, the question we face is whether, taking the evidence in the light most favorable to Lapid, there remains a genuine dispute as to whether there was sufficient evidence before the Board that Lapid's requested accommodations (i.e., the variance and site plan applications for the proposed Facility) were unreasonable.

The municipal defendants in this case argue that certain features of Lapid's proposed Facility that resulted from its excessive size and the fact that approximately two acres at the back of the lot (the whole lot was 4.17 acres) were unusable because they were covered with protected wetlands shows that the plan would have imposed an "undue hardship" on the Township, and that it would have "required a fundamental alteration" in the nature of the Township's zoning program. Hovsons, 89 F.3d at 1104. The municipal defendants point to two categories of objections to the site plan that they identified during the hearing process as evidence that the accommodations that Lapid requested (in the form of the site plan and non-use variances) were unreasonable (i.e., that they would have imposed an "undue hardship upon the Township," or that they would have required the Township to "fundamentally alter" its zoning program, see Hovsons, 89 F.3d at 1104).

The two main categories that the Board identified are (1) traffic safety issues (including traffic movement within the parking lot, increased traffic on Martine Avenue, and safety of ingress and egress from the parking lot); and (2) inadequate access for emergency vehicles. We think that the Board raised serious and legitimate concerns about these issues and that Lapid failed to rebut these concerns

30

or to account for them by altering its proposed plan, and that therefore summary judgment for the defendants was proper on the reasonable accommodations claim. To help describe these concerns, we set forth the proposed site plan that Lapid presented to the Board at the March 24 meeting.

(see next page)

31

ID: Graphic Map

1. Traffic Safety Concerns

The municipal defendants flag several different concerns regarding traffic safety issues that they say show that the site plan that Lapid proposed was unreasonable. Several of the criticisms that the Board's experts presented on the traffic safety issues center on potential hazards at the point of ingress and egress from the Facility's proposed parking lot, particularly the fact that the entrance to the parking lot requires a 180 degree turn for cars turning right and a sharp turn across oncoming cars for cars turning left. Both Harold Maltz, the Board's traffic consultant, and Paul Ferriero, the Board's engineer, opined that the turns into the parking lot were too sharp and would force cars to make multiple-point "K turns" that would disrupt the flow of traffic into and out of the Facility's parking lot and would increase the likelihood of an accident.

Maltz stated that "a vehicle coming south on Martine [Avenue] making a right, [would] essentially [be required to make] a hundred and eighty degree turn to turn into the site, . . . [and the vehicle would have] to be able to make another hundred and eighty degree turn to drop off a passenger at the main entrance." Ferriero commented that in order to make the two sharp turns that a car must make in order to reach the passenger drop off area, a driver would have to be "very familiar with the site or have planned in advance." Similarly, Maltz predicted in his written report that a car attempting to make a right turn after entering the parking lot would tend to stray into the lane of oncoming traffic (due to the tight 180 degree turn that is required), thereby increasing the likelihood of an accident.

The Board's experts also predicted that the defects in the point of ingress/egress would increase the risk of an accident happening on Martine Avenue. Sergeant James Rau, the police department's director of traffic safety, predicted that the difficult turn-in site and its closeness to the intersection of Martine Avenue and West Broad Street would cause cars turning into the Facility to pause for longer than normal. He concluded that this would increase the likelihood of accidents. Rau also stated in his report that drivers seeking to go south on Martine Avenue through

33

a green light at the intersection of Martine and West Broad could be forced into the right lane (to go around cars waiting to turn left) and would be forced immediately to switch back into the right lane (to avoid cars turning in to the Facility's parking lot). This, he concluded, would also increase the likelihood of accidents.

Lapid's engineer agreed at the March 4 meeting that redesigning the area of ingress/egress was a "good suggestion," but failed to submit a redesigned plan dealing with the traffic safety criticisms regarding ingress/egress. Lapid also did not point to any information in the record that contradicts the Board's experts' opinions that the design of the entrance to the Facility's parking lot posed traffic safety hazards.

The Board's experts also raised concerns about internal traffic safety, i.e., within the Facility's parking lot, especially with respect to delivery trucks that would be forced to go around to the loading dock at the south side of the building and would then be unlikely to be able to turn around without backing up a long distance. Both Ferriero and Maltz testified that the parking lot's layout would require delivery trucks to back a long way out of the driveway into the parking area in order to turn around and that this would create a situation that was hazardous to public safety. Ferriero commented that "to leave the[loading area] would require a fairly long backing maneuver across the pedestrian access to the site." Similarly, Maltz observed in his written report to the Board that "[t]here is no K-turn ability for trucks readily available from the loading zone or dumpster area, except after backing up about 200 feet around a curve and across a painted crosswalk."

Lapid has not pointed to any place in the record where it countered these criticisms. And, although Szalay, Lapid's civil engineer, agreed at the March 4 hearing that it would be a "good suggestion" to create a turn-around area for trucks, Lapid did not alter its site plan to account for the problems that the Board's experts flagged.

2. Emergency Vehicle Access

The Board also identifies its concerns about inadequate access for safety vehicles as an alternative reason why the

proposed plan would cause an "undue hardship" for the Township by requiring it to compromise the safety of its residents. As noted above, there is some dispute about whether Fire Chief Ellis ever gave Lapid adequate information on the turning radius that was necessary for a "tower ladder" fire truck to access an emergency vehicle lane that was to swing around the back of the building; (the inability to drive a tower ladder truck behind the Facility was one of the problems that the Fire Chief identified with Lapid's plan). See supra note 1. Even if we discount the comments of Fire Chief Ellis, however, several other experts testified before the Board about their concerns that emergency vehicles would either be unable to access the rear of the building or would be unable to back out once they got there. Lapid presented almost no counter-testimony, and although Lapid's engineer, Szalay, agreed that the narrowness of the access road could be a problem, Lapid did not amend its site plan to provide a wider access way.

In addition to Ellis, Ferriero and Maltz both flagged the issue of emergency vehicle access as a problem with the site plan in both written reports and public testimony. Ferriero's report of March 3, 1999 stated that:

> The plan shows a fire lane extending to the rear of the building. The centerline radius of this drive is 43.5 feet, which is a minimal radius for access. The difficulty with the fire lane as shown is that exiting the fire lane will require backing a vehicle around this same tight radius with the edge of the drive within two feet of the building. If the vehicle is slightly off track to the inside by starting the turn too early, it will strike the building. If the vehicle is too far to the outside by turning too late or too wide, it will run off the access down a 33% slope.

Ferriero's report also pointed out that the emergency vehicle access lane would actually be narrowed to around seven feet when the sidewalk ramp at the rear of the building was fitted with handrails and curbs, as is required by the ADA. He concluded that this would be too narrow to accommodate any emergency vehicle.

35

Maltz, the traffic engineer, provided similar criticisms of the site plan's emergency access way. Maltz echoed Ferriero's comments about the narrowness of the lane, and the effect of the extension of the handrails into the fire access lane. He also wrote that he had done tests with models using the turning radius of a standard bus going around an access way with the same turning radius and dimensions as the one proposed by Lapid. He concluded from his tests that it "appears probable" that a fire truck's "wheels will leave the grass pavers area and proceed down the [adjacent 33%] slope."9

Szalay, Lapid's civil engineer, agreed during the Board's March 4 meeting, that in particular, the presence of the handrails would present a problem. He also agreed that the problem of backing out emergency vehicles from behind the building was "a legitimate issue." However, Lapid did not revise its site plan to account for these criticisms regarding emergency vehicle access before the final hearing with the Board on March 24, 1999. It seems likely that the wetlands (and the required wetland buffer zone), which were located close behind the proposed location for the emergency access lane, were the reason that Lapid did not change its site plan to provide a wider vehicle access lane. In his March 4 testimony, Szalay admitted that the wetlands

_____

9. Lapid suggests that the Board's expressed concerns about the Township's ability to drive a tower ladder truck behind the Facility (due to an insufficient turning radius) were pretextual, arguing that residents of two-story nursing homes are unlikely candidates for heroic rescues from ladder trucks. We agree that it makes little sense to require a two-story building that would house residents who are unable to be carried out on a ladder during a fire to provide access for tower ladder trucks. However, the Board's concerns about emergency vehicle access focused not only on the turning radius of the access lane, but also the width of the lane. The Board's experts expressed concern that under Lapid's plan, the lane would be as narrow as seven feet at one point. There is evidence in the record that this would prevent all of Scotch Plains's fire vehicles from accessing the rear of the building (because they are all at least eight feet wide). Indeed, as noted above, Lapid's engineer agreed that the presence of the handrails would present a problem. Therefore, even discounting the issues regarding the turning radius of the emergency access lane, the Board still raised serious concerns about emergency vehicle access that Lapid acknowledged, but did not address.

36

posed a substantial constraint to widening the access way.
Nor did Lapid present any evidence that would undermine
or call into question the Board's experts' opinions on the
emergency vehicle access route. We agree that with respect
to its limited safety vehicle access, the site plan would
impose the "undue hardship" on the Township of
compromising the safety of its residents.

Therefore, we conclude that it was proper to grant
summary judgment to the Township on the issue of
whether it had shown that Lapid's requested
accommodations with respect to the site plan were
unreasonable because they would cause an "undue
hardship" on the Township. The Board presented sufficient
evidence to grant summary judgment in its favor with
respect to the site plan approval and non-use variances,
which were sufficient bases for it to deny the entire
application.

IV. Was Summary Judgment Proper on the
      Disparate Impact Claim?

The plaintiffs also appeal the grant of summary judgment
on their claim that the Township's ordinances have a
disparate impact on the handicapped in violation of 42
U.S.C. S 3604(f). Plaintiffs may make out a claim under the
FHAA using a theory of disparate impact without providing
proof of discriminatory intent. Doe v. City of Butler, 892
F.2d 315, 323 (3d Cir. 1989).

When reviewing disparate impact claims brought under
the FHAA, we have borrowed from the framework of Title
VII disparate impact claims. See Resident Advisory Bd. v.
Rizzo, 564 F.2d 126, 148 (3d Cir. 1977); see also
Huntington Branch, NAACP v. Huntington, 844 F.2d 926,
934 (2d Cir. 1988), aff 'd 488 U.S. 15 (1988) (per curiam).
In order to make a prima facie case of disparate impact
under the FHAA, the plaintiff must show that the
Township's action had a greater adverse impact on the
protected group (in this case the elderly handicapped) than
on others. If the plaintiffs succeed in demonstrating a
prima facie case, then the burden shifts to the defendant to
show that it had a legitimate, non-discriminatory reason for

37

the action and that no less discriminatory alternatives were available. See Rizzo, 564 F.2d at 149.

The District Court found that in this case, the plaintiffs failed to make a prima facie case of disparate impact. The District Court relied on the formulation of the elements of a prima facie case for disparate impact under the FHAA that the Ninth Circuit set forth in Gamble v. City of Escondido, 104 F.3d 300 (9th Cir. 1997). There, the court "identified the following elements of an FHA[A] prima facie case under a disparate impact theory: (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." Id. at 306 (internal quotation marks and citation omitted).

The only evidence that Lapid cites to support its prima facie case of disparate impact is that Scotch Plains's zoning plan designates only one location in the Township for "senior housing."10 This location is part of the Township's Broadway Redevelopment Plan, which the plaintiff argues is located in an undesirable location, a light industrial area rather than a residential area. Lapid also points out that the town permits no development of senior residences as of

_____

10. The District Court allowed the plaintiff to get discovery and rely on evidence from outside the administrative record to support its FHAA disparate impact claim. We hold that reviewing courts should limit their review to the administrative record only on reasonable accommodations claims. It was proper for the District Court to allow the plaintiffs to rely
on materials from outside the administrative record to support their disparate impact claims. It makes sense that a plaintiff would need broader discovery and more latitude on the evidence that he or she is allowed to present in a disparate impact claim than in a failure to make reasonable accommodations claim. The first involves demonstrating a discriminatory pattern resulting from the impact of the municipality's decisions, whereas the latter turns only on information regarding the necessity and reasonableness of the proposed accommodation, all of which can be presented to a local land use board in the first instance. Furthermore, this distinction is consistent with the approach of other courts that have addressed the proper scope of materials reviewed under FHAA reasonable accommodations and disparate impact claims. See, e.g., United States v. Village of Palatine , 37 F.3d 1230, 1233 n.3 (7th Cir.
1994).

38

right (that is, the development is not permitted without the grant of a use variance), in any other part of the Township besides the Broadway Redevelopment Area.

Accepting as true Lapid's arguments on these points, we do not believe that they are sufficient to make out a prima facie case. They ignore the fact that under New Jersey law, developers of group homes for the handicapped (including the elderly) may apply for use variances as an "inherently beneficial use" in any zone. See Smart SMR of N.Y., Inc. v. Borough of Fair Lawn Bd. of Adjustment, 704 A.2d 1271, 1281 (N.J. 1998) (noting that the New Jersey Supreme Court has recognized nursing homes as "inherently beneficial uses"). Applicants for an "inherently beneficial use" under New Jersey law face a reduced standard for demonstrating that the use qualifies for a use variance (as opposed to applicants for commercial use variances). See supra at 16. Therefore, even though Scotch Plains's land use regime affirmatively provides for senior housing in only one location, that alone does not establish a prima facie case of discriminatory impact, especially in light of the fact that the Township will entertain use variances for elderly housing on a preferential basis in all other locations. Furthermore, as the District Court noted, the plaintiff does not present any evidence of a pattern of the town refusing to grant variances for housing for the elderly or any other conduct or statistics that would evince a disparate impact.

We also agree with the District Court that even if we were to determine that Lapid had demonstrated a prima facie case of disparate impact, it would be appropriate to grant summary judgment on the issue that Scotch Plains has demonstrated that it had non-discriminatory reasons for denying Lapid's site plan application. The test for whether the government has articulated a legitimate bona fide governmental interest that would support denying the application and that no alternative would serve the interest with less discriminatory effect, see Rizzo at 148-49, is similar to the test of whether the defendant has demonstrated that the requested accommodation is "unreasonable" for the purposes of rebutting a claim under S 3604(f)(3)(B). The Board has pointed to sufficient evidence to show that the requested accommodations were

39

unreasonable; the same evidence suffices to show a bona fide governmental interest in denying Lapid's site plan application.

For the foregoing reasons, we will affirm the order of the District Court.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit